

RECEIVED

MAR 29 2021

AT 8:30
WILLIAM T. WALSH
CLERK

United States District Court
District of New Jersey

Malcolm C. Donley
    Movant.

    v.

United States of America
    Respondent.

Crim No. 88-66 (BRM)

Movant's Reply to the Government
Opposition to His Motion for Compassionate
Release Under 18 USC § 3582(c)(i)

Now Comes the Movant, Malcolm C. Donley,
pro-se, and herein files this reply to the gov-
ernments opposition motion. The governments
response seem very disingenuous and seems
to ignore the information and guidence put forth
by the Department of Justice and the CDC.
Additionally, they seem to ask this Court to
ignore a key ruling of the United States
Supreme Court. Let me explain.

1. Both the DoJ and CDC recognize that movants
age and medical condition are in fact "compelling

— 1 —

extraordinary reasons" that warrant com-passionate release.

As an initial matter, the government claims that this movant lacks any medical condition that places him at higher risk from Covid-19. Nothing could be further from the truth. This petitioner suffers from "hypertension"; and he is 63 years of age. Both these conditions have been recognized by the CDC as placing a person at increased risk from Covid-19 as shown on the chart below:



Centers for Disease Control and Prevention, *COVID-19 Associated Hospitalization Related to Underlying Medical Conditions*, available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/covid-data/hospitalization-underlying-medical-conditions.pdf (last visited Feb. 24, 2021).

So from the above chart it is clear the people who suffer from hypertension are 3 times more likely to require hospitalization if they contract Covid-19. Age, also plays a vital role in putting a person at an increased risk, as the below chart clearly shows:



Monant is 63 years old. That alone makes him 25 times more likely to be hospitalized than a person between the ages of 5-17, and he is 400 times more likely to die. The governments claim is simply incorrect.

Centers for Disease Control and Prevention, *COVID-19 Hospitalization and Death by Age*, available at https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last visited Feb. 24, 2021).

Next as both the government as this court is aware, in May of 2020, the Department of Justice released a directive to prosecutors that stated that they should "concede" that inmates with certain CDC risk factors had in fact presented "extraordinary and compelling reasons" that support a request for compassionate release because they have shown that they have "a serious physical or medical condition... that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility, and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n1 (A)(ii)(I). That directive by the DOJ has not been retracted, and of course "hypertension" was on that list.

2. Next, the government claims that because this defendant has already contracted Covid, and because the BOP has labeled him as being "recovered", that that is somehow proof that he is not still in danger of death from Covid 19. Again nothing could be farther from the truth, as the following DOJ releases clearly show:

—4—

There have now been inmates who have been infected, apparently recovered, and later died. At FCI Terre Haute, an inmate tested positive for COVID-19 on January 11, 2021, was placed in isolation, and was considered "recovered" on January 25, 2021 after completing isolation and having no symptoms; on February 7, 2021, he was found unresponsive and died:[50]



**U.S. Department of Justice**
**Federal Bureau of Prisons**

---

**FOR IMMEDIATE RELEASE**
February 9, 2021

Contact: Office of Public Affairs
202-514-6551

### Inmate Death at FCI Terre Haute

WASHINGTON, D.C.: On Monday, January 11, 2021, inmate Joseph Lee Fultz tested positive for COVID-19 at the Federal Correctional Institution (FCI) Terre Haute in Terre Haute, Indiana and was placed in medical isolation. On Monday, January 25, 2021, in accordance with Centers for Disease Control and Prevention (CDC) guidelines, Mr. Fultz was converted to a status of recovered following the completion of medical isolation and presenting with no symptoms. On Sunday, February 7, 2021, Mr. Fultz was found unresponsive in his cell and responding staff immediately initiated life-saving measures. Staff requested emergency medical services (EMS) and life-saving efforts continued. Subsequently on the same day, Mr. Fultz, who had long-term, pre-existing medical conditions which the CDC lists as risk factors for developing more severe COVID-19 disease, was pronounced deceased by EMS personnel.

Inmate Fultz was a 52-year-old male sentenced out of the Southern District of Iowa to a 324-months sentence for Sexual Exploitation of Children. He had been in custody at FCI Terre Haute since January 7, 2021.

FCI Terre Haute is a medium security facility that currently houses 841 male offenders.

The Bureau of Prisons will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/index.jsp.

Additional information about the Bureau of Prisons can be found at www.bop.gov.

### ###

---

[50] U.S. Department of Justice, Federal Bureau of Prisons, *Inmate Death at FCI Terre Haute* (Feb. 9, 2021), available at https://www.bop.gov/resources/news/pdfs/20210209_press_release_thx.pdf (last visited Feb. 23, 2021).

4.5

At USP Atlanta, an inmate tested positive for COVID-19 on March 30, 2020, and he was considered "recovered" on April 23, 2020 after completing isolation, having no symptoms, and testing negative; he still required hospital care and died on January 15, 2021:[51]



**U.S. Department of Justice**
**Federal Bureau of Prisons**

---

**FOR IMMEDIATE RELEASE**
January 22, 2021

Contact: Office of Public Affairs
202-514-6551

### Inmate Death at USP Atlanta

WASHINGTON, D.C.: On Monday, March 30, 2020, inmate Spencer Sarver was transported to a local hospital for further treatment and evaluation due to shortness of breath. Subsequently on the same day, he tested positive for COVID-19. While at the hospital, his condition worsened and he was placed on a ventilator. On Thursday, April 23, 2020, in accordance with Centers for Disease Control and Prevention (CDC) guidelines, Mr. Sarver was converted to a status of recovered following the completion of medical isolation and presenting with no symptoms. On the same day, Mr. Sarver tested negative for COVID-19 and was removed from the ventilator. However, Mr. Sarver still required constant hospital care. On Friday, January 15, 2021, Mr. Sarver, who had pre-existing medical conditions, which the CDC lists as risk factors for developing more severe COVID-19 disease, was pronounced deceased by hospital staff.

Mr. Sarver was a 65-year-old male who was sentenced in the Northern District of West Virginia to an 84-month sentence for Conspiracy to Distribute and Possession With Intent to Distribute Methamphetamine. He had been in custody at USP Atlanta since September 16, 2019.

USP Atlanta is a medium security facility that currently houses 1,870 male offenders.

The Bureau of Prisons will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/index.jsp.

Additional information about the Bureau of Prisons can be found at www.bop.gov.

###

---

[51] U.S. Department of Justice, Federal Bureau of Prisons, *Inmate Death at USP Atlanta* (Jan. 22, 2021), available at https://www.bop.gov/resources/news/pdfs/20210123_press_release_atl.pdf (last visited Feb. 23, 2021).

(

At FCI Terre Haute, an inmate tested positive for COVID-19 on September 14, 2020 and was found to be "recovered" on September 24, 2020 after completing isolation and having no symptoms; he tested positive for COVID-19 again on December 12, 2020 and subsequently died on January 9, 2021:[52]



**U.S. Department of Justice**
**Federal Bureau of Prisons**

---

**FOR IMMEDIATE RELEASE**
January 21, 2021

Contact: Office of Public Affairs
202-514-6551

### Inmate Death at FCI Terre Haute

WASHINGTON, D.C.: On Monday, September 14, 2020, Inmate Shauntae Hill tested positive for COVID-19 at the Federal Correctional Institution (FCI) Terre Haute in Terre Haute, Indiana and was placed in medical isolation. On Thursday, September 24, 2020, in accordance with Centers for Disease Control and Prevention (CDC) guidelines, Mr. Hill was converted to a status of recovered following the completion of medical isolation and presenting with no symptoms. On Saturday, December 12, 2020, Mr. Hill again tested positive for COVID-19 and was subsequently transported to a local hospital for further treatment and evaluation. His condition worsened and he was placed on a ventilator. On Saturday, January 9, 2021, Mr. Hill, who had long-term pre-existing medical conditions, which the CDC lists as risk factors for developing more severe COVID-19 disease, was pronounced deceased by hospital staff.

Mr. Hill was a 44-year-old male who was sentenced out of the Western District of Michigan to a 144-month sentence for Possession with Intent to Distribute Methamphetamine. He had been in custody at FCI Terre Haute since January 30, 2020.

FCI Terre Haute is a medium security facility that currently houses 998 male offenders.

The Bureau of Prisons will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/index.jsp.

Additional information about the Bureau of Prisons can be found at www.bop.gov.

### ###

---

[52] U.S. Department of Justice, Federal Bureau of Prisons, *Inmate Death at FCI Terre Haute* (Jan. 21, 2021), available at https://www.bop.gov/resources/news/pdfs/20210121_press_release_thx.pdf (last visited Feb. 23, 2021).

At FCI Memphis, an inmate tested positive for COVID-19 on December 20, 2020, was considered "recovered" on December 29, 2020 after completing isolation and having no symptoms, and died on January 12, 2021:[53]



**U.S. Department of Justice**
**Federal Bureau of Prisons**

**FOR IMMEDIATE RELEASE**
January 15, 2021

Contact: Office of Public Affairs
202-514-6551

### Inmate Death at FCI Memphis

WASHINGTON, DC:  On Sunday, December 20, 2020, inmate Harry Edward Cunningham tested positive for COVID-19 at the Federal Correctional Institution (FCI) Memphis in Memphis, Tennessee, and was placed in medical isolation.  On Tuesday, December 29, 2020, in accordance with Centers for Disease Control and Prevention (CDC) guidelines, Mr. Cunningham was converted to a status of recovered following the completion of medical isolation and presenting with no symptoms.  On Sunday, January 10, 2021, Mr. Cunningham was evaluated by institution medical staff and subsequently transported to a local hospital for paracentesis for massive ascites. On Tuesday, January 12, 2021, Mr. Cunningham, who had long-term pre-existing medical conditions, which the CDC lists as risk factors for developing more severe COVID-19 disease, was pronounced deceased by hospital staff.

Mr. Cunningham was a 54-year old male who was sentenced in Middle District of Tennessee to a 72-month sentence for Bank Robbery and Hobbs Act Robbery.  He had been in custody at FCI Memphis since August 26, 2020.

FCI Memphis is a medium security facility that currently houses 1,036 male offenders.

The Bureau of Prisons will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/index.jsp.

Additional information about the Bureau of Prisons can be found at www.bop.gov.

### ###

---

[53] U.S. Department of Justice, Federal Bureau of Prisons, *Inmate Death at FCI Memphis*, available at https://www.bop.gov/resources/news/pdfs/20210115_press_release_mem_cunningham.pdf (last visited Feb. 23, 2021).

At FCI Jesup, an inmate tested positive for COVID-19 on November 9, 2020, was

considered "recovered" on November 19, 2020 after completing isolation and having no

symptoms, and died on January 8, 2021:[54]



**U.S. Department of Justice**
**Federal Bureau of Prisons**

**FOR IMMEDIATE RELEASE**
January 12, 2021

Contact: Office of Public Affairs
202-514-6551

### Inmate Death at FCI Jesup

WASHINGTON, D.C.:   On Monday, November 9, 2020, inmate Kevin Gayles tested positive for COVID-19 at the Federal Correctional Institution (FCI) Jesup in Jesup, Georgia, and was immediately placed in medical isolation.   On Thursday, November 19, 2020, in accordance with Centers for Disease Control and Prevention (CDC) guidelines, Mr. Gayles was converted to a status of recovered following the completion of medical isolation and presenting with no symptoms.

On Friday, January 8, 2021, he was evaluated by institution medical staff for chest pains and subsequently transported to a local hospital for further treatment and evaluation.   On the same day, Mr. Gayles who had pre-existing medical conditions, which the CDC lists as risk factors for developing more severe COVID-19 disease, was pronounced deceased by hospital staff.

Mr. Gayles was a 38-year-old male who was sentenced in the Eastern District of Virginia to a 132-month sentence for Possession of Cocaine Base.   He had been in custody at FCI Jesup since September 7, 2018.

FCI Jesup is a medium security facility that currently houses 1,337 male offenders.

The Bureau of Prisons will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/index.jsp.

Additional information about the Bureau of Prisons can be found at www.bop.gov.

###

---

[54] U.S. Department of Justice, Federal Bureau of Prisons, *Inmate Death at FCI Jesup*, available at https://www.bop.gov/resources/news/pdfs/20210113_press_release_jes.pdf (last visited Feb. 23, 2021).

At FCI Lompoc, an inmate tested positive for COVID-19 on May 4, 2020, was found to be "recovered" on May 20, 2020, went to the hospital on August 20, 2020 due to progressive paralysis, and died on December 15, 2020:[55]



**U.S. Department of Justice**
**Federal Bureau of Prisons**

**FOR IMMEDIATE RELEASE**
December 18, 2020

Contact: Office of Public Affairs
202-514-6551

### Inmate Death at FCI Lompoc

WASHINGTON, D.C.: On Monday, May 4, 2020, inmate Christopher Carey tested positive for COVID-19 and was placed in medical isolation at the Federal Correctional Institution (FCI) Lompoc in Lompoc, California. Institution staff provided treatment and monitored his condition. On Wednesday, May 20, 2020, in accordance with Centers for Disease Control and Prevention (CDC) guidelines, Mr. Carey was considered recovered after completing isolation and presenting no symptoms.

On Thursday, August 20, 2020, Mr. Carey was transported from FCI Lompoc to a local hospital due to progressive paralysis requiring bedside care. On Tuesday, December 15, 2020, Mr. Carey, who had long-term, pre-existing medical conditions which the CDC lists as risk factors for developing more severe COVID-19 disease, was pronounced deceased by hospital medical staff.

Mr. Carey was a 72-year-old male who was sentenced in the District of Nevada to a 135-month sentence for Possession of Child Pornography. He had been in custody at the Federal Correctional Complex (FCC) Lompoc since February 10, 2016.

FCI Lompoc is a low security facility that currently houses 947 male offenders.

The Bureau of Prisons will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/index.jsp

Additional information about the Bureau of Prisons can be found at www.bop.gov.

###

---

[55] U.S. Department of Justice, Federal Bureau of Prisons, *Inmate Death at FCI Lompoc* (Dec. 18, 2020), available at https://www.bop.gov/resources/news/pdfs/20201217_press_release_lom.pdf (last visited Feb. 23, 2021).

At FCI Butner (Low), an inmate tested positive for COVID-19 on June 1, 2020,

tested negative for COVID-19 on July 6, 2020, had symptoms on September 9, 2020,

tested positive again on September 16, 2020, and died on September 17, 2020:[56]



**U.S. Department of Justice**
**Federal Bureau of Prisons**

---

**FOR IMMEDIATE RELEASE**
September 17, 2020

Contact: Office of Public Affairs
202-514-6551

### Inmate Death at FCI Butner (Low)

WASHINGTON, D.C.: On Monday, June 1, 2020, inmate Ricky Lynn Miller tested positive for COVID-19. On Monday, July 6, 2020, Mr. Miller tested negative for COVID-19. Mr. Miller was evaluated by institutional medical staff at the Federal Correctional Institution (FCI) Butner (Low) in Butner, North Carolina on Wednesday, September 9, 2020 for issues relating to shortness of breath and leg edema. He was transferred to a local hospital for treatment and further evaluation. On Wednesday, September 16, 2020, Mr. Miller tested positive for COVID-19 at the outside hospital. On Thursday, September 17, 2020, Mr. Miller, who had long-term, pre-existing medical conditions, which the CDC lists as risk factors for developing more severe COVID-19 disease, was pronounced dead by hospital staff.

Mr. Miller was a 62-year-old male who was sentenced in the Northern District of Texas to a 210-month sentence for Receipt of a Visual Depiction of a Minor Engaging in Sexually Explicit Conduct. He had been in custody at the Federal Correctional Complex (FCC) Butner since July 11, 2018.

FCI Butner is a Low security facility that currently houses 1,050 male offenders.

The Bureau of Prisons will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/index.jsp.

Additional information about the Bureau of Prisons can be found at www.bop.gov.

### ###

---

[56] U.S. Department of Justice, Federal Bureau of Prisons, *Inmate Death at FCI Butner (Low)* (Sept. 17, 2020), available at https://www.bop.gov/resources/news/pdfs/20200917_press_release_bux.pdf (last visited Feb. 23, 2021).

At FMC Lexington, an inmate tested positive for COVID-19 on May 29, 2020, was placed in isolation until July 10, 2020 with two negative COVID-19 tests, went to the hospital on July 22, 2020 due to a stroke, and died on July 29, 2020:[57]



**U.S. Department of Justice**
**Federal Bureau of Prisons**

---

**FOR IMMEDIATE RELEASE**
July 31, 2020

Contact: Office of Public Affairs
202-514-6551

### Inmate Death at FMC Lexington

WASHINGTON, D.C.: On Friday, May 29, 2020, inmate Gerald Porter tested positive for COVID-19 and was immediately placed in isolation at the Federal Medical Center (FMC) Lexington in Lexington, Kentucky. On July 10, 2020, Mr. Porter was released from isolation based upon two COVID-19 negative tests. On Wednesday, July 22, 2020, Mr. Porter was admitted to the local hospital due to a stroke, where his condition continued to deteriorate. On Wednesday, July 29, 2020, Mr. Porter, who had pre-existing medical conditions, which the CDC lists as a risk factors for developing more severe COVID-19 disease, was pronounced dead by hospital staff.

Mr. Gerald Porter was a 73 year-old male sentenced in the Eastern District of Virginia to an 144-month sentence for Receipt of Images of Minors Engaging in Sexually Explicit Conduct. He had been in the custody of FMC Lexington since December 18, 2017.

FMC Lexington is an Administrative security facility that currently houses 1,274 offenders.

The Bureau of Prisons will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/index.jsp.

Additional information about the Bureau of Prisons can be found at www.bop.gov.

### ###

---

[57] U.S. Department of Justice, Federal Bureau of Prisons, *Inmate Death at FMC Lexington* (July 31, 2020), available at https://www.bop.gov/resources/news/pdfs/20200731_press_release_lex.pdf (last visited Feb. 23, 2021).

At FMC Fort Worth, an inmate tested negative for COVID-19 on April 21 and 23, 2020, had symptoms on April 27, 2020, tested positive for antibodies, and died on July 3, 2020:[58]



**U.S. Department of Justice**
**Federal Bureau of Prisons**

**FOR IMMEDIATE RELEASE**
July 3, 2020

Contact: Office of Public Affairs
202-514-6551

### Inmate Death at FMC Fort Worth

WASHINGTON, D.C.:  On April 21, 2020 and April 23, 2020, Inmate Robert Hague-Rogers was tested for COVID-19 with negative results.  On April 27, 2020, Mr. Hague-Rogers was seen by Health Services staff at the Federal Medical Center (FMC) Fort Worth for shortness of breath.  At that time, Mr. Hague-Rogers was transported to a local hospital for further treatment and evaluation.  Although he never tested positive for COVID-19, he did have a positive antibody test.  On Friday, July 3, 2020, Mr. Hague-Rogers, who had long-term, pre-existing medical conditions, which the CDC lists as risk factors for developing more severe COVID-19 disease, was pronounced dead by hospital staff.

Mr. Hague-Rogers was an 83-year-old male who was sentenced in the Northern District of Texas to a 120-month sentence for Conspiracy to Commit Theft or Embezzlement from an Employee Benefit Plan and Conspiracy to Commit Healthcare Fraud.  He had been in custody at FMC Fort Worth since May 9, 2013.

FMC Fort Worth is an Administrative facility that currently houses 1351 male offenders.

The Bureau of Prisons will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/index.jsp

Additional information about the Bureau of Prisons can be found at www.bop.gov.

### ###

---

[58] U.S. Department of Justice, Federal Bureau of Prisons, *Inmate Death at FMC Fort Worth* (July 3, 2020), available at https://www.bop.gov/resources/news/pdfs/20200703_press_release.pdf (last visited Feb. 23, 2021).

At FCI Terminal Island, an inmate tested positive for COVID-19 on April 16, 2020, was found to be "recovered" on May 10, 2020, had symptoms on May 15, 2020, tested negative for COVID-19 on May 15 and 16, 2020, and died on May 24, 2020:[59]



**U.S. Department of Justice
Federal Bureau of Prisons**

---

**FOR IMMEDIATE RELEASE**
May 27, 2020

Contact: Office of Public Affairs
202-514-6551

### Inmate Death at the FCI Terminal Island

WASHINGTON, D.C.: On April 16, 2020, inmate Adrian Solarzano, tested positive for COVID-19 at the Federal Correctional Institution (FCI) Terminal Island in San Pedro, California. On May 10, 2020, in accordance with Centers for Disease Control and Prevention (CDC) guidelines, Mr. Solarzano was converted to a status of recovered following the completion of isolation and presenting with no symptoms.

On Friday, May 15, 2020, Mr. Solarzano was admitted to the local hospital, due to complaints of chest pains and anxiety. He was tested for COVID-19 by hospital staff on May 15 and 16, 2020, with negative results. Mr. Solarzano's condition continued to decline. On Sunday, May 24, 2020, Mr. Solarzano, who had long-term, pre-existing medical conditions, which the CDC lists as risk factors for developing more severe COVID-19, was pronounced dead by hospital staff.

Mr. Solarzano was a 54-year-old male who was sentenced in the Central District of California to a 293-month sentence for Racketeer Influenced and Corrupt Organizations Conspiracy, Conspiracy to Possess with Intent to Distribute and Distribute Methamphetamine, Possession With Intent to Distribute Methamphetamine and Felon in Possession of Firearm. He had been in custody at FCI Terminal Island since August 14, 2013.

FCI Terminal Island is a low security facility that currently houses 1,023 male offenders in San Pedro, California.

The Bureau of Prisons will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/index.jsp.

Additional information about the Federal Bureau of Prisons can be found at www.bop.gov.

###

---

[59] U.S. Department of Justice, Federal Bureau of Prisons, *Inmate Death at the FCI Terminal Island* (May 27, 2020), available at https://www.bop.gov/resources/news/pdfs/20200527_press_release_trm.pdf (last visited Feb. 23, 2021).

13



**U.S. Department of Justice**
**Federal Bureau of Prisons**

---

**FOR IMMEDIATE RELEASE**
September 17, 2020

Contact: Office of Public Affairs
202-514-6551

### Inmate Death at FCI Butner (Low)

WASHINGTON, D.C.: On Monday, June 1, 2020, inmate Ricky Lynn Miller tested positive for COVID-19. On Monday, July 6, 2020, Mr. Miller tested negative for COVID-19. Mr. Miller was evaluated by institutional medical staff at the Federal Correctional Institution (FCI) Butner (Low) in Butner, North Carolina on Wednesday, September 9, 2020 for issues relating to shortness of breath and leg edema. He was transferred to a local hospital for treatment and further evaluation. On Wednesday, September 16, 2020, Mr. Miller tested positive for COVID-19 at the outside hospital. On Thursday, September 17, 2020, Mr. Miller, who had long-term, pre-existing medical conditions, which the CDC lists as risk factors for developing more severe COVID-19 disease, was pronounced dead by hospital staff.

Mr. Miller was a 62-year-old male who was sentenced in the Northern District of Texas to a 210-month sentence for Receipt of a Visual Depiction of a Minor Engaging in Sexually Explicit Conduct. He had been in custody at the Federal Correctional Complex (FCC) Butner since July 11, 2018.

FCI Butner is a Low security facility that currently houses 1,050 male offenders.

The Bureau of Prisons will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/index.jsp.

Additional information about the Bureau of Prisons can be found at www.bop.gov.

### 

14

The reasons for these deaths, and the reason why the danger to this movant life might be greater than at any time previous is simple. Prisoners are prime targets for re-infection. This is clearly explained in the attached "Declaration of Tara Vijayan, MD, M.P.H. In her declaration, Dr. Vijayan explains that:

"Re-infection with SARS-CoV-2 has been documented, with some individuals presenting with more severe disease than the first infection." Id. at #9.

"Based on what we know from other related coronaviruses, people appear to become susceptable to reinfection around 90 days after onset of infection." Id. at #8.

"From the data we have, it appears that an individual can become infected again as early as three weeks later, but in general, it appears that most infections occur at least three months later." Id. at #10.

"Prisons and jails are such environments

—15—

where re-exposure with high viral inoculum is likely, and I expect to see reinfection happening in prisons and jails in the months to come." Id. at 14.

Lastly Dr. Vijayan states: "Even if a person recovers from a first infection with the virus, that does not mean that they will recover from a subsequent infection. An individual could survive a first infection and die from a subsequent infection". Id at 25.

It should be clear from the above that the Covid pandemic, and the threat to movants life and health is not over, and the BOP's "recovered" label does not mean much. This movant is still suffering from sever fatigue, shortness of breath, pounding heart, body soreness, headaches, and brain fog. The BOP medical staff says that there is nothing they can do about these symptoms. Should I be reinfected with covid in this weakened condition, death is a very real possibility.

3. Vaccines and Covid-19 at FCI Pekin

Although guards and a few inmates have
been administered vaccines, this movant
has not. Officials at Pekin FCI have
proven that, dispite their best efforts, they
are powerless to protect the inmate population
from Covid-19. This institution has suffered
outbreaks of 100, 200, and 400 inmates sick
with Covid-19. The reason for this is well
known. There is no way to protect against
an asymptomatic guard bring the virus
into the institution. Guards and other staff
come and go daily. Re-infection is just a
matter of time. On page 7 of the governments'
letter motion they admitt that vaccinated
people con still transmit the virus to the un-
vaccinated, should they become infected.

4. § 3553(a) Favors Compassionate Release

The government claims that the factors
set forth in § 3553(a) weigh against this
court granting compassionate release. But,
the government con only support that

— 17 —

argument by pointing to one single 3553(a)
factor. That is the seriousness of the offense.
There can be no doubt that murder is the
most serious of offenses. But, under §
3553(a), that is not all this court must
consider. This court must also consider "the
history and characteristics of the defendant."
See § 3553 (a)(1). The United States Supreme
Court has made it clear that this considera-
tion must include " Post offense developments"
(See <u>Pepper v. United States</u>, 526 U.S. 476 (2011)).

Petitioner committed this offense in 1988,
when he was just 30 years old. He is now
63 years old, and the 30 year old man he was
no longer exist. He has served 33 years of
incarceration, and in those 3 plus decades, he
has done everything in his power to, (dispite
his life sentence), rehabilitate himself. As
the governments exhibit "C" shows, he has
acquired his GED, completed the Information
processing vocational Training course, learned
to type, taking computer classes, completing the
"Stop the Violence" course, completed the Quality
Control vocational Course, completed the Micro

— 18 —

Soldering Vocational Program, and other courses.

Secondly has only had a single institution infraction in the last 18 years, and that one was "minor", the lowest severity infraction in the BOP. In fact the BOP scores movant as having a "minimum" risk of reoffending. This is due to his prison record, and the fact that he has no criminal history other than speeding tickets. And 63 year old men are in the lowest risk group for recidivism

Third, there is nothing in defendants' background or prison record that even suggest that at this advanced age, he would be any danger to the public. Again the BOP has him at "minimum" risk of reoffending.

Finally, the need to avoid sentencing disparities are not at issue in this circumstance. "Compassionate release" is exactly that — "compassion." As stated mose elogently by Judge Torres in United State v. Zukerman, No. 1:16-cr-194 (S.D. NY. April 3, 2020) "the severity of the defendants conduct remains unchanged. What has changed

— 19 —

however, is the envirornment where [defendant] is serving his sentence. When the Court sentenced the [defendant], the Court did not intend for that sentence to include a great and unforseen risk of sever illness or death brough on by a global pandemic."

In closing, the only thing that I can add to the above statement is that no defendant, no matter how remorefull, can change his past actions. But, he can chang himself. My life, since my incarceration, reflects my sincerest attempt at doing just that. Again I ask that this Court grant my compassionate release.

Respectfully Submitted:

_____

Malcolm C. Donley, pro-se
Reg. No. 01972-050
FCI Pekin
P.O. Box 5000
Pekin, IL 61555

—20—

# Exhibit A

**DECLARATION OF TARA VIJAYAN, M.D., M.P.H.**

1. My name is Tara Vijayan. I am a physician specializing in infectious diseases and internal medicine, and I am Board Certified in both fields. I received my medical degree at Albert Einstein College of Medicine and my post-graduate training at the University of California, San Francisco. In addition to a medical doctorate, I have a master's degree in public health, specializing in epidemiology, from the University of California at Berkeley.

2. I have been practicing medicine for 13 years. This year I was voted a "Top Doctor" by Los Angeles Magazine. I have won two teaching awards since I joined the faculty at the David Geffen School of Medicine, was inducted into Alpha Omega Alpha at my medical school, and have been awarded several research fellowships over my career.

3. I currently serve as an assistant clinical professor in the Division of Infectious Diseases at the David Geffen School of Medicine at the University of California, Los Angeles. I have been in this position for the last five years. I see patients in both the inpatient and outpatient settings.

4. I have been working through the SARS-CoV-2 (commonly referred to as "COVID-19") pandemic and treating patients with the virus. I estimate I have treated approximately 100 patients who have tested positive for the virus. In addition, as the Medical Director of our Antimicrobial Stewardship Program, I am the lead author for our treatment guidance on COVID-19 and serve as a leader in our Division of Infectious Diseases COVID-19 pandemic response.

**Immunity**

5. There are still many aspects of this particular virus that we are studying, and we do not have enough information about this virus and infection to provide exact numbers.

6. We have a limited understanding of the duration of immunity among patients who have tested positive for SARS-CoV-2. The immune response is a complex process. One study published in the New England Journal of Medicine demonstrated a rapid decay in the concentration of protective antibody titers within 90 days of infection.[1]

7. We also have some indication of how long immunity might last from studies of other coronaviruses. For example, we already know that people get reinfected regularly throughout their lives with seasonal coronaviruses that cause some common colds. The data on these coronaviruses suggest that any immunity to this particular coronavirus may not last long.

8. I agree with the guidance published by the Centers for Disease Control on immunity to the virus, which states:

   a. "The duration and robustness of immunity to SARS-CoV-2 remains under investigation. Based on what we know from other related human coronaviruses, people appear to become susceptible to reinfection around 90 days after onset of infection. To date, reinfection appears to be uncommon during the initial 90 days after symptom onset of the preceding infection[.]"[2]

9. Re-infection with SARS-CoV-2 has been documented, with some individuals presenting with more severe disease than the first infection.[3] This

---

[1] Ibarrondo FJ, Fulcher JA, Goodman-Meza D, Elliott J, Hofmann C, Hausner MA, Ferbas KG, Tobin NH, Aldrovandi GM, Yang OO. *Rapid Decay of Anti-SARS-CoV-2 Antibodies in Persons with Mild Covid-19.* N Engl J Med. 2020 Sep 10;383(11):1085-1087. doi: 10.1056/NEJMc2025179.

[2] Centers for Disease Control, *Duration of Isolation and Precautions for Adults with COVID-19* (Oct. 19, 2020) *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html.

[3] Kim AY, Gandhi RT. *Re-infection with SARS-CoV-2: What Goes Around May Come Back Around.* Clin Infect Dis. 2020 Oct 9:ciaa1541. doi: 10.1093/cid/ciaa1541. Epub ahead of print. PMID: 33035308.

1       suggests that at least in some proportion of individuals immunity is not
2       sufficiently protective.

3  **Reinfection**

4  10. As stated above, re-infection has been documented. Some factors that have
5       been proposed to contribute to reinfection include: the lower durability and
6       robustness of immunity with mild infection; the viral inoculum at the time of
7       re-exposure; and, viral escape mutations.[4]

8  11. If someone was infected with the virus six or seven months ago, and had
9       recovered from it five or six months ago, it is very possible that they no
10      longer have immunity to the virus and can become infected again. From the
11      data we have, it appears that an individual can become infected again as early
12      as three weeks later, but in general, it appears that most reinfections occur at
13      least three months later.[5]

14 12. For example, in one case, a 36-year-old doctor practicing in an intensive care
15      unit was infected with the virus in March and was ill through early April. Her
16      symptoms resolved about 24 days after infection. She was then tested, and
17      tested negative, 33 days and 67 days after the onset of her first symptoms.
18      She had returned to work in the intensive care unit, where she was exposed
19      to the virus again. Twelve weeks after the first onset of symptoms, the doctor
20      again fell ill and tested positive for the virus.[6] This is likely an example of
21      reinfection occurring after immunity dissipated, in an environment of regular
22      exposure to the virus.

---

[4] *Id.*
[5] *Id.*
[6] Torres DA, Ribeiro LDCB, Riello APFL, Horovitz DDG, Pinto LFR, Croda J. *Reinfection of COVID-19 after 3 months with a distinct and more aggressive clinical presentation: Case report.* J Med Virol. 2020 Oct 28. doi: 10.1002/jmv.26637. Epub ahead of print. *Available at* https://onlinelibrary.wiley.com/doi/full/10.1002/jmv.26637.

3

13. I agree with the guidance published by the Centers for Disease Control on reinfection, which is:

   a. "To date, reports of reinfection have been infrequent. Similar to other human coronaviruses where studies have demonstrated reinfection, the probability of SARS-CoV-2 reinfection is expected to increase with time after recovery from initial infection due to waning immunity and possibly genetic drift. Risk of reinfection depends on the likelihood of re-exposure to infectious cases of COVID-19. As the COVID-19 pandemic continues, we expect to see more cases of reinfection."[7]

14. The possibility of reinfection is more likely in an environment where re-exposure with a high viral inoculum is likely. Prisons and jails are such environments where re-exposure with a high viral inoculum is likely, and I expect to see reinfection happening in prisons and jails in the months to come.

15. It will be important to continue to test people who have previously tested positive in order to monitor for reinfection and a subsequent wave of cases in prisons and jails. Without continuing, widespread testing at prisons and jails, those same facilities that had prior outbreaks could see subsequent outbreaks, which could be just as large and just as deadly.

**Prisons and Jails**

16. At present, the incidence of COVID-19 in correctional facilities in the United States is very high. In other words, many cases are traced to prisons and jails and the associated contacts in the community of those prisons and jails.

17. Those who are housed in prisons and jails are likely to be re-exposed to the

---

[7] Centers for Disease Control, *Duration of Isolation and Precautions for Adults with COVID-19* (Oct. 19, 2020) *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html.

4

DECLARATION OF DR. TARA VIJAYAN

1    virus because of the unique features of the environment, including
2    congregate living and antiquated or poor ventilation, and because there is
3    already widespread infection in these facilities.

4    18. As requested, I have reviewed the following records that were provided to
5    me:

6        a. A Press Release by the Bureau of Prisons from September 17, 2020,
7           detailing the infection and death of Ricky Lynn Miller, an individual
8           who was incarcerated at FMC Butner (Attachment 1).

9        b. Affidavits written by three individuals at the Lompoc prison, Marlin
10          Lee Gougher, James Mazon, and Robert Rocha, detailing the history
11          of their test results (Attachment 2).

12   19. These documents state that all of these individuals were infected with SARS-
13   CoV-2 (they all tested positive). Mr. Miller tested positive at the beginning
14   of June, while the individuals at Lompoc tested positive at the beginning of
15   May. Mr. Miller had an intervening negative test. All four then tested positive
16   more than three months later—in September and October.

17   20. It is certainly possible that all of these individuals were reinfected either due
18   to a decline in their immunity or a lack of sufficient immune response at the
19   onset. In the cases of the three individuals at Lompoc, it would appear that
20   they tested positive for a second time more than four months after their
21   original positive test, and in one instance, closer to five months later. While
22   I cannot confirm that these are cases of reinfection, due to the lack of interval
23   testing as well as the lack of more granular details such as the cycle threshold,
24   it is certainly possible that these are all cases of reinfection, given our limited
25   understanding of immunity as well as the environment in which these
26   individuals are living and being regularly re-exposed to the virus.

27   21. Complete clearance of a prison of transmissible virus is not possible in the
28   absence of a highly effective, durable vaccine, like the measles vaccine, and

5

DECLARATION OF DR. TARA VIJAYAN

1    the likelihood of this remains uncertain (see below). Furthermore, the

2    movement of staff and prisoners in and out of the prison makes this even less

3    likely. Prisons are prime spaces for re-exposures.

4    22. Prisons and jails are responsible for a large number of cases as well as more

5    severe illness from the virus. The case rate in prisons is at least 5.5 times

6    higher than the general population, and the age-adjusted death rate is 3 times

7    higher than that of the overall U.S. population.[8]

8    23. People who are incarcerated often experience poor health, and many of the

9    health conditions they face place them at high risk of complications and death

10    from SARS-CoV-2. Research has shown that the prevalence of chronic

11    health conditions for individuals in prisons and jails is 24.5% to 42.8% higher

12    than in the general population.[9]

13    24. According to a case-tracking project for incarcerated populations, there had

14    been at least 197,659 prisoners in the United States who had tested positive

15    for the virus and at least 1,454 prisoner deaths, as of November 17, 2020.[10]

16    This number does not take into account the associated cases or deaths in the

17    community.

---

[8] Saloner B, Parish K, Ward JA, DiLaura G, Dolovich S. *COVID-19 cases and deaths in federal and state prisons*. JAMA. 2020;324(6):602-603.

[9] *See* Wilper AP, Woolhandler S, Boyd JW, et al. *The health and health care of US prisoners: results of a nationwide survey*. Am J Public Health. 2009;99(4):666-672; Bai JR, Befus M, Mukherjee DV, Lowy FD, Larson EL. *Prevalence and predictors of chronic health conditions of inmates newly admitted to maximum security prisons*. J Correct Health Care. 2015;21(3):255-264; Rosen DL, Thomas S, Kavee AL, Ashkin EA. *Prevalence of chronic health conditions among adults released from the North Carolina prison system, 2015-2016*. N C Med J. 2019;80(6):332-337; Maruschak LM, Berzofsky M, Unangst J., *Special Report: Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics (Oct. 4, 2016), last accessed Nov. 23, 2020, *available at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[10] The Marshall Project, *A state-by-state look at coronavirus in prisons* (Nov. 20, 2020) *available at* https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons.

## Recovery

25. Even if a person recovered from a first infection with the virus that does not mean that they will recover from a subsequent infection. An individual could survive a first infection and die from a subsequent infection.

26. Likewise, people who had a mild or asymptomatic disease course the first time around very well may not have a mild or asymptomatic disease course with subsequent reinfection. Severe illness from COVID-19 is defined as hospitalization, admission to the ICU, intubation or mechanical ventilation, or death.

27. Studies suggest that individuals who previously had severe cases have a stronger and longer-lasting immunity to SARS-CoV-2 infection than individuals who had a milder illness.[11]

28. The long-term complications are highly variable, but several conditions can persist for months, including the loss of taste or smell, shortness of breath, and fatigue, and infection can also result in damage to the heart, lungs, kidneys, and nervous system.[12] Some studies suggest that long-term lung damage, including scarring, can occur in even mild cases.[13]

29. There are also situations in which patients develop persistent symptoms long after the virus can be detected in the body, for as long as six months or more.

---

[11] Ibarrondo FJ, Fulcher JA, Goodman-Meza D, Elliott J, Hofmann C, Hausner MA, Ferbas KG, Tobin NH, Aldrovandi GM, Yang OO. *Rapid Decay of Anti-SARS-CoV-2 Antibodies in Persons with Mild Covid-19.* N Engl J Med. 2020 Sep 10;383(11):1085-1087. doi: 10.1056/NEJMc2025179.

[12] Rubin R. *As Their Numbers Grow, COVID-19 "Long Haulers" Stump Experts.* JAMA. 2020 Sep 23. doi: 10.1001/jama.2020.17709. Epub ahead of print. PMID: 32965460; Marshall M. *The lasting misery of coronavirus long-haulers.* Nature. 2020 Sep;585(7825):339-341. doi: 10.1038/d41586-020-02598-6. PMID: 32929257.

[13] *See, e.g.,* Lois Parshley, *The Emerging Long-Term Complications of COVID-19, Explained,* Vox (June 12, 2020), *available at* https://www.vox.com/platform/amp/2020/5/8/21251899/coronavirus-long-termeffects-symptoms.

DECLARATION OF DR. TARA VIJAYAN

1    These patients are often referred to in the lay and scientific press as 'long-

2    haulers.' 'Long-haulers' report a variety of symptoms, including persistent,

3    extraordinary fatigue, shortness of breath, body aches, and an inability to

4    focus or fogginess.[14]

5    **A Vaccine**

6    30. The Pfizer and Moderna vaccine developments are promising. In a controlled

7    trial setting, the efficacy appears to be >90%. We do not know how long the

8    immune response from the vaccine series will last. We also do not know

9    about the real-world effectiveness of these vaccines.

10   31. Additionally, we do not know if the vaccine will be as effective in certain,

11   critical sub-populations, specifically: older individuals, those with lowered

12   immune systems, and those with obesity—the very populations at risk for

13   severe disease. Historically, certain vaccines have been less effective in

14   eliciting a sufficient immune response and preventing disease in these

15   populations (notably the influenza vaccine and even the hepatitis B vaccine,

16   which otherwise has excellent efficacy).[15]

17   32. While we are all hopeful that the current vaccine contenders will be

18   distributed to the broader population by the summer or fall of 2021, there is

19   currently no set time for when prisoners and correctional facility staff will be

20

21   [14] Rubin R. *As Their Numbers Grow, COVID-19 "Long Haulers" Stump Experts*.
     JAMA. 2020 Sep 23. doi: 10.1001/jama.2020.17709. Epub ahead of print. PMID:
22   32965460; Marshall M. *The lasting misery of coronavirus long-haulers*. Nature.
     2020   Sep;585(7825):339-341.   doi:   10.1038/d41586-020-02598-6.   PMID:
23   32929257.

24   [15] Lee JH, Hong S, Im JH, Lee JS, Baek JH, Kwon HY. *Systematic review and
     meta-analysis of immune response of double dose of hepatitis B vaccination in
25   HIV-infected patients*. Vaccine. 2020 May 19;38(24):3995-4000. doi:
     10.1016/j.vaccine.2020.04.022; Izurieta HS, Lu M, Kelman J, Lu Y, Lindaas A,
26   Loc J, Pratt D, Wei Y, Chillarige Y, Wernecke M, MaCurdy TE, Forshee R.
     *Comparative effectiveness of influenza vaccines among U.S. Medicare
27   beneficiaries ages 65 years and older during the 2019-20 season*. Clin Infect Dis.
28   2020 Nov 19:ciaa1727. doi: 10.1093/cid/ciaa1727. Epub ahead of print.

8

1    vaccinated.

2    33. Even an effective vaccine that is successfully and widely distributed—and

3        administered to an entire jail population and its staff—is not going to be a

4        silver bullet. Again, we do not know how long the immune response will last.

5    34. I anticipate that current public health measures such as physical distancing

6        and masking will remain essential to mitigate the pandemic for the next two

7        years, particularly in congregate settings such as prisons and jails.

8    35. Mitigating the pandemic, for all of the above-stated reasons, requires more

9        than targeting immunity. A successful strategy will focus on preventing

10       infection and preventing the spread of the virus.

11    36. We must manage our resources well. A large outbreak of thousands of cases

12      associated with a local prison or jail will seriously deplete hospital and other

13      resources for treating infected individuals.

14    37. I wholly agree with the large number of public health experts who have stated

15      that further decarceration is a critically important strategy in mitigating the

16      toll of this virus.

17

18   I state the foregoing is true and correct under penalty of perjury of the laws of the

19   United States of America.

20

21

22   Dated:  11/24/2020

23                          Dr. Tara Vijayan

24

25

26

27

28

⇔01972-050⇔

Malcolm C Donley Sr.
01972-050
Federal Correctional Instution
P.O. Box 5000
Pekin, IL 61555
United States

CERTIFIED MAIL®

7020 1290 0000 3970 7636



U.S. POSTAGE PAID
FCM LG ENV
PEKIN, IL
61554
MAR 26, 21
AMOUNT
**$0.00**
R2304H109477-31

1000    08608





RECEIVED

MAR 2 6 2021

FCI PEKIN
MAIL ROOM

⇔01972-050⇔
United States Courthouse
Attn. Office Of The Clerk
402 E State ST
Trenton, NJ 08608
United States

Legal Mail

