**DAVID E. SCHAFER**
*Attorney-at-Law*
3131Princeton Pike
Bldg. 2B, Suite 105
Lawrenceville, NJ 08648
(609)439-7790
schafdave@gmail.com

Honorable Brian R. Martinotti                                                   July 12, 2021
(By e-filing)

*United States v. Malcolm C. Donley*
Crim. No. 88-66 (BRM)

## SUPPLEMENT TO MOTION FOR COMPASSIONATE RELEASE

Dear Judge Martinotti:

The following is a supplement to Donley's *pro se* Request for Compassionate Release filed 11/01/20 (Docket Document 2), filed as a Reply to the Government's Response to the *pro se* Request filed 03/01/21 (Docket Document 5). The supplement will first address extraordinary and compelling reasons why the Court should reduce Donley's sentence, and secondly bring to light some historical factors that weigh in favor of release pursuant to 18 U.S.C. §3553(a).

## I. EXTRAORDINARY AND COMPELLING REASONS TO REDUCE SENTENCE

The compassionate release statute allows the District Court to reduce Donley's sentence when "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. §3582(c)(1)(A)(i). Pursuant to 28 U.S.C. §994(t), the Sentencing Commission eventually stated that "extraordinary and compelling reasons" included medical conditions, age, family circumstances and "other reasons." U.S.S.G. §1B1.13 (n. 1(A) to (D)).

The statute above did not change when the First Step Act was enacted, because the legislation again did not define what would constitute "extraordinary and compelling reasons." In that four-word phrase, Congress had explicitly told the Department of Justice that the Bureau of Prisons' adequacy in treating an inmate's medical condition was not a point to consider—it was the mere having a vulnerable condition that would constitute a reason for the Department of Justice to release an inmate. Also, since the Sentencing Commission has not found a quorum to revise the federal sentencing guidelines after the enactment of the First Step Act, it has addressed neither the expansion of the motion to the District Courts nor the effects of the ongoing COVID-19 pandemic.

Therefore, as Congress did not impose any limitations on a District Court's discretion as to what constituted "extraordinary and compelling reasons," the District Court alone can decide if there are reasons to "justify a reduction of an unusually long sentence." S. Rep. No. 98-225, at 55-56 (1983):

> Today, compassionate release is widely understood as a means of
> protecting defendants from suffering harm due to unforeseen changed
> circumstances during their sentence. (Citations omitted). This is
> more true than ever now, in light of the passage of the First Step Act
> of 2018, Pub. L. No. 115-391, 132 Stat. 5194, the spread of COVID-19,
> and the emerging consensus among the Courts of Appeals that "district
> courts need not consider U.S.S.G §1B1.13 when ruling on defendant-
> filed compassionate release motions." *United States v. Elias,* 984 F. 3d
> 516, 519 (6th Cir. 2021).

*United States v. Bass,* 2021 U.S. Dist. LEXIS 28791 at *4-5, __ F. Supp. 3d __, 2021 WL
526337 (E.D. Michigan, filed February 8, 2021). *See, also, United States v. Jones,* 980 F. 3d
1098, 1111-1112 (6th Cir. 2020)

Three days before District Judge Tarnow filed this more in-depth explanation of why he
granted Bass's motion for compassionate release (*see United States v. Bass,* 2021 U.S. Dist.
LEXIS 11719, __ F. Supp. 3d __, 2021 WL 228904 (E.D. Michigan, filed January 22, 2021)),
the Sixth Circuit upheld his decision to release an inmate despite a life-imprisonment sentence
without parole, but stayed his release until the merits panel affirmed his decision:

> The district court immediately released him from his life sentence
> without the possibility of release for conspiracy to distribute cocaine
> and cocaine base and firearms murder during or in relation to a
> drug trafficking crime.

*United States v. Bass,* 843 Fed. Appx. 733, 2021 U.S. App. LEXIS 3334, 2021 WL 476467 (6th
Cir., filed February 5, 2021). *See, also,* other cases where the defendants were released from
federal life-imprisonment sentences; *United States v. Lopez,* 2020 U.S. Dist. LEXIS 200076 at
*20 (D. Haw. October 27, 2020); *United States v. Fisher,* 493 F. Supp. 3d 231, 2020 U.S. Dist.
LEXIS 188065, at *8 (S.D.N.Y. October 9, 2020); *United States v. Hope,* 2020 U.S. Dist. LEXIS
86395, at *6 (S.D. Fla. April 10, 2020); *United States v. Millan,* 2020 U.S. Dist. LEXIS 59955,
at *48 (S.D. N.Y. April 6, 2020) (the reasons for each release is explained in *Bass,* 1/22/21
opinion at *25 to *27).

The Sixth Circuit noted that the sentencing guidelines never provided any advice to the
Courts on what was the mathematical equivalent to a life sentence:

> A jury imposed a life sentence without the possibility of release.
> Even without that finding, Bass's guideline range was life. The
> sentencing guidelines do not define an equivalent term of months
> or years for a life sentence. The Sentencing Commission, however,
> equates a life sentence with 470 months imprisonment. U.S.
> Sentencing Commission, 2019 Annual Report & Sourcebook of
> Federal Sentencing Statistics, app. A at 203          (*Id.* at 737).

2

Long before the First Step Act was enacted and *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005) decided that the federal sentencing guidelines were only advisory, even the Third Circuit recognized that a life imprisonment sentence under 18 U.S.C. §1111 with no parole could still be reduced. *United States v. Donley*, 878 F. 3d 735, 741 (f. n. 12) (3d Cir 1989).

Although the Sixth Circuit questioned whether Bass's "morbid obesity is an extraordinary and compelling reason supporting compassionate release", it did not question District Judge Tarnow's "'full discretion' to determine what reasons are 'extraordinary and compelling'." *Id.* at 735, citing *Jones, supra* at 1111.

There is no doubt that Judge Tarnow had a difficult time and a complete about-face by releasing Bass:

> This Court presided over Bass's three-week trial, during which
> witness after witness recounted his horrifying crimes. This Court
> sentenced Bass to two concurrent life terms upon the jury's verdict.

*Bass*, 2/8/21 opinion at *8. The Sixth Circuit delved into greater detail concerning Bass's "horrific" acts:

> Bass masterminded a drug conspiracy whose members were coerced
> to cooperate through violence. He personally perpetrated that
> violence, even going so far as to torture an organization member.
> The operation involved multiple family members, and Bass
> ultimately arranged the murder of his brother. He then personally
> murdered his brother's killer, not out of revenge, but to destroy
> evidence of his duplicity.

*Bass*, 2/5/21 opinion at **6, 736.

Donley has high blood pressure (hypertension) (Exhibit 3), high cholesterol (hyperlipidemia) (Exhibit 4), and at 64 years old is at a vulnerable age where either one of these ailments could cause a stroke or heart attack. The threat is even greater due to the complications he had when he contracted COVID-19 (Exhibits 5 and 6). With the recent announcement by Pfizer that a third shot (second booster) will be recommended, the burgeoning scourge of the Delta variant infiltrating the entire United States and world (Japan forbade spectator attendance at the summer Olympics a few days ago), COVID-19 is definitely still a risk to Donley due to his race, his residence in a detention facility and his medical conditions, despite his vaccination. (Exhibits 8 to 12). The risk is exaggerated by BOP's secondary status when it comes to emergency room availability (Exhibit 7). Donley has already felt the administrative delay for urgent care when he sat in isolation for a month and was only transferred to a hospital when he was found to be seriously ill as he was leaving isolation (Exhibit 4).

Donley respectfully submits that his age, hypertension and hyperlipidemia, with his lungs

3

potentially compromised by his first bout with COVID-19, are "extraordinary and compelling reasons" for compassionate release, and requests the Court to weigh the 18 U.S.C. §3553 (a) factors in favor of his immediate release.

## II. HISTORICAL FACTORS THAT WEIGH IN FAVOR OF RELEASE

At the time of the offense, Donley stabbed himself five times, any wound of which could have been fatal (Exhibit 1-5 to 7 (page 7 of Donley's Appellate Brief)); although most of the historical records are missing, including Appellant's Appendix, counsel found Donley's Appellate Brief in storage). Thus, although the jury found that the murder was premediated, the premeditation was ephemeral and it was more a crime of passion. Thus, the "circumstances of the offense," although extremely serious, were not on the level of a lengthy premeditation by a cold-blooded killer in an execution-style homicide, such as Bass's crimes were described in the aforementioned cases (Exhibit 2-8 to 10 (page 6 of Donley's Appellate Brief)). *See* 18 U.S.C. §3553(a)(1).

The history and characteristics of Donley, from what counsel recalls, are that he was born and raised in Chicago, had served in the Air Force at McGuire (*see, also,* Government Exhibit A, page 1, entry 11 that notes, "VETERAN – YES"), and there had met and married his wife. The "two criminal history points" noted by the Government's Brief on page 8-18 were either traffic or municipal court violations (*see* U.S.S.G. §4A1.2(c)(1)); he would not have been allowed to live on base after a serious offense or felony conviction. He had no prior criminal history before the instant offense. Regarding the Government's reference to his "numerous disciplinary violations," (Government Exhibit B), seven of the twelve were for "refusal to appear," which could have been for any assortment of sickness; the only significant one, "possession of a dangerous weapon," could have been caused by a forbidden metal pen—in any event, a single mishap seventeen years ago. For an inmate having struggled through 12,000 days of life imprisonment with no chance for parole, these minor violations over 33 years of incarceration is a "notable feat." *Bass,* 1/22/21 opinion at *20-21.

The BOP's designation that Donley is at the MINIMUM RISK RECIDIVISM LEVEL (Government Exhibit A, page 1, entry 35) should assure the Court that the public is not at risk from Donley. He has done his utmost to rehabilitate himself within the federal institutions. His list of educational advancement is exemplary (Government Exhibit C).

Unlike Bass, Donley had no codefendants to whom the Court can compare his term of imprisonment. However, as the Sixth Circuit noted, "But the relevant disparity is not to his codefendants and, instead, to 'federal defendants on a national scale.'" *Bass,* 2/5/21 opinion at **9-10, 737 (citation omitted).

This disparity factor, U.S.S.G §3553 (a)(6), brings up an extraordinary and singular chronological situation in the adjudication of Donley's case. Offenders before and after him

4

"with similar records who have been found guilty of similar conduct" could choose from certain outcomes when deciding to accept a plea agreement or proceed to trial. Donley's alternatives were uncertain.

Those convicted of first-degree murder under 18 U.S.C §1111 and facing a life sentence of imprisonment before the federal sentencing guidelines came into effect on November 1, 1987 were eligible for parole after ten years. 18 U.S.C. §4205(a) (repealed). On November 1, 1987, pursuant to the Sentencing Reform Act of 1984, parole was abolished. *Donley, supra* at 736, 741 ("the Sentencing Guidelines provide no possibility of parole"), and f. n. 13 ("and there is no parole"). Those convicted of the same crime after *Mistretta v. United States*, 488 U.S. 361, 109 S. Ct. 647 (1989) was filed on January18, 1989, ruling that the federal sentencing guidelines were constitutional, were certain that there would be no parole on a life sentence. Those sentenced in the intervening fourteen months for the same crime were in Limbo, not sure whether they would serve a life sentence without parole or with parole after ten years.

Donley was one of them, committing the murder on February 16, 1988 (Exhibit 2), and sentenced on November 28, 1988 (Docket Document 1, filed 11/1/20). Sometime between the murder and trial, the Assistant United States Attorney prosecuting the case (now a CJA attorney for the District of New Jersey) offered Donley a plea agreement to second-degree murder, the guidelines of which counsel recalls called for an imprisonment term of about seventeen years (disregarding a potential upward departure). Counsel brings this up not to illustrate that the Government did not have absolute confidence in the strength of its case, but to show that the Government believed that Donley attempted suicide after killing his wife (Exhibit 1-12 to 14; Exhibit 1A-19 to 23 (page 27 of Donley's Appellate Brief)). The personal sorrow and regret of Donley began minutes after the crime, and it has weighed heavily on him during the next 33 years. This circumstance alone shows a huge disparity between Donley and other inmates across the nation serving a life sentence.

For all of the above reasons, Donley humbly asks the Court to grant his motion for compassionate release.

Respectfully submitted,

*David Schafer*

David Schafer
Attorney for Malcolm C. Donley

approximately 4:00 a.m. that same morning. (Da 308-5 to 11).
Before Doctor Harrison operated on appellant, he interviewed
appellant in the emergency room. (Da 312-20 to 313-8). At
that time, appellant again admitted killing his victim. (Da
313-12 to 24). Five of appellant's wounds could have been
fatal at the time of his admittance. (Da 308-18 to 309-10; Da
327-17 to 25; Da 318-19 to 23; Da 322-12 to 18).

Throughout his stay at Walson Army Hospital, appellant
was in the intensive care unit. For three days he was on a
ventilator; he also had several intravenous lines. (Da 317-3
to 14). During his stay, he was treated with morphine,
valium, haldol and curare. (Da 317-15 to 20). The hospital
took precautions to prevent appellant from committing suicide.
(Da 318-24 to 319-2).

On February 18, the Trenton Times quoted James Knights
of the FBI as stating, "[Appellant] is heavily sedated and
will remain so for the next three or four days." (Da 84-15 to
17). Despite knowing of appellant's heavy sedation, the FBI
interviewed appellant the following day, on February 19. (Da
63-11 to 21). Appellant told the FBI on that day that another
man in the apartment had stabbed him, (Da 600-14 to 18),
despite having told Doctor Harrison both three days before, on

EXHIBIT 1

-7-

For instance, the District Court improperly allowed the hearsay testimony despite the Government's proffer that the declarant's statements were of past conduct remembered, which is strictly forbidden by the very wording of Fed.R.Evid. 803(3):

> (MS. SINGER):   Linda told her that she wanted
> Malcolm to leave the house, she
> wanted a separation from Malcolm
> and she was telling Malcolm, she
> had told Malcolm to leave, that
> she had told him she also was
> being forced to leave...
> (Da 162-25 to 163-3).

See, also, Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933).

In addition, in the instant case, "there [was] no claim of self-defense, suicide, accidental death, or any other plausible issue that would justify an inquiry into the victim's state of mind." Brown, supra at 780. Appellant went so far as to relinquish any self-defense claim in his opening statement. (Da 166-14 to 167-9; Da 154-7 to 13). In fact, he even stipulated that all of his wounds had been self-inflicted. (Da 473- 11 to 25).

Furthermore, by allowing victim's mother to take the stand and testify as to her daughter's statements, the District Court allowed victim's mother to elaborate upon matters that were extremely prejudicial to appellant. (Da 191-9 to 194-5). The biographical data she supplied merely

EXHIBIT / (A)

## STATEMENT OF FACTS

At 2:26 a.m. on February 16, 1988, a law enforcement officer at McGuire Air Force Base in New Jersey received a phone call that there was a domestic disturbance at 2745 Falcon Courts East. (Da 215-19 to 217-9).

Officers dispatched to the scene could get no answer at 2745D, the home of appellant and his wife, victim Linda Donley. (Da 225-2 to 227-12).

At 3:49 a.m. the same night, the same officer received second phone call from appellant, who stated that his wife was dead as the result of a fight. (Da 217-19 to 24).

Officers dispatched to 2745D this time found appellant and victim. Appellant answered the door dressed only in a towel, with stab wounds to his stomach, neck and wrists. (Da 231-13 to 232-6; Da 274-25 to 6). Victim was found deceased in her bed in the upstairs master bedroom, with a knife next to her, a hatchet between her legs, and a meat cleaver under her. (Da 247-21 to 248-15). There had been no sign of a struggle. (Da 247-3 to 20). At this time, appellant admitted killing victim, stating, "We had an argument and I killed her." (Da 233-21).

Appellant was transported to Walson Army Hospital at Fort Dix. Doctor Harrison began treating appellant at

*EXHIBIT 2*

-6-

| Inmate Name: | DONLEY, MALCOLM C | | | | Reg #: | 01972-050 |
|---|---|---|---|---|---|---|
| Date of Birth: | 06/18/1957 | Sex: | M | Race: BLACK | Facility: | PEK |
| Encounter Date: 01/13/2021 10:41 | | Provider: Lee Ho, Jeffrey MD | | | Unit: | B02 |

## Renew Medication Orders:

| Rx# | Medication | Order Date |
|---|---|---|
| | Indication: Hypertension, Benign Essential | |
| 162793-PEK | hydroCHLOROthiazide 25 MG Tab | 01/13/2021 10:41 |
| | Prescriber Order: Take one-half tablet (12.5 MG) by mouth each morning x 180 day(s) | |
| | Indication: Hypertension, Benign Essential | |
| 162795-PEK | Ibuprofen 800 MG Tab | 01/13/2021 10:41 |
| | Prescriber Order: Take one tablet (800 MG) by mouth with food twice daily x 180 day(s) | |
| | Indication: Pain in unspecified joint | |
| 162794-PEK | Lisinopril 20 MG Tab | 01/13/2021 10:41 |
| | Prescriber Order: Take one tablet (20 MG) by mouth each day x 180 day(s) | |
| | Indication: Hypertension, Benign Essential | |

## New Laboratory Requests:

| Details | Frequency | Due Date | Priority |
|---|---|---|---|
| Chronic Care Clinics-Hypertension-Lipid Profile | One Time | 12/27/2021 00:00 | Routine |
| Chronic Care Clinics-Hypertension- | | | |
| Comprehensive Metabolic Profile (CMP) | | | |

## Disposition:

Follow-up at Sick Call as Needed
Follow-up at Chronic Care Clinic as Needed
Will Be Placed on Callout
Follow-up in 1 Year

## Other:

Showed inmate some shoulder exercises to stretch left shoulder.

## Patient Education Topics:

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 01/13/2021 | Counseling | Plan of Care | Lee Ho, Jeffrey | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** No
**Telephone/Verbal Order:** No

Completed by Lee Ho, Jeffrey MD on 01/13/2021 10:49



EXHIBIT 3

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| Inmate Name: | DONLEY, MALCOLM C | | | | Reg #: | 01972-050 |
|---|---|---|---|---|---|---|
| Date of Birth: | 06/18/1957 | Sex: | M | Race: BLACK | Facility: | PEK |
| Note Date: | 01/06/2021 11:44 | Provider: | | Lee Ho, Jeffrey MD | Unit: | B02 |

Admin Note - Orders encounter performed at Health Services.
**Administrative Notes:**

ADMINISTRATIVE NOTE 1      Provider: Lee Ho, Jeffrey MD
     Consult

## New Consultation Requests:

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Emergency Room | 01/08/2021 | 01/08/2021 | Emergent | No | |

     Subtype:

         Emergency Room

     Reason for Request:

         63 y.o black male with history of HTN, Hyperlipidemia, and Chronic right knee pain, with 2.5 week history of cough, chest congestion with chest pressure, fatigue, headache, and decreased oral intake. He had a rapid COVID-19 test on 12/04/2020 which was positive. Numerous inmates within his housing unit also tested positive for COVID-19. He has been in isolation since 12/04/2020. He was suppose to come off isolation today but during medical assessment, he complained of shortness of breath and appeared in respiratory distress. O2 sats on room air was 84%. HE was placed on )2 at 4L NC which brought his O2 sats up to 98%. Ambulance subsequently called and arrangements for transfer to the local ED for further evaluation were made.

     Provisional Diagnosis:

         Dyspnea, COVID pneumonia

**Copay Required:** No      **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Lee Ho, Jeffrey MD on 01/06/2021 11:45



*EXHIBIT 4*

2020-12-22 07:50   UtilizationManagemen 309 683 6157 >> FCI Pekin Medical          P 2/6

**FCI/FPC PEKIN**                                              01972-050

# Donley, Malcolm

MRN: 97516770

Dhaval R Save, MD        Discharge Summary  A ☒        Date of Service: 12/19/2020 11:48 AM
Physician                Signed
Hospitalist

## Hospitalist Physician Discharge Summary

**Facility:** UPH PEKIN HOSPITAL
**Name:** Malcolm Donley
**CSN:** 853309976
**MRN:** 97516770
**DOB:** 6/18/1957, 63 y.o. Male

**PCP:** Jeffrey B Lee Ho, MD

**Disposition:** Home

**Condition of Patient at Discharge:** Stable

**Admission Date:** 12/17/2020

**Discharge Date:** 12/19/2020

### Hospitalization

**Hospital Problems: Present on Admission:**
- Pneumonia due to COVID-19 virus
- Acute respiratory failure with hypoxia (HCC)
- Essential hypertension
- Other hyperlipidemia
- Viral sepsis (HCC)

**Resolved Problems:** Resolved Problems:
* No resolved hospital problems. *

**Resolving Problems:**
**Patient Active Problem List**
Diagnosis
- Pneumonia due to COVID-19 virus
- Acute respiratory failure with hypoxia (HCC)
- Essential hypertension
- Other hyperlipidemia
- Viral sepsis (HCC)

**Consultations:** None

S. MOATS, M.D.
CLINICAL DIRECTOR
FCI/FPC Pekin
12-30-20

*EXHIBIT 5*

**Procedures:** \* No surgery found \*

*Pending Results: none*

*Things to be ordered/followed by PCP as outpatient: none*

**Hospital Course:**

**Patient Summary:**
63-year-old man with medical history significant for hypertension, hyperlipidemia presented with worsening shortness of breath and cough

# Acute respiratory failure with hypoxia:
Resolved
Secondary to viral pneumonia from COVID-19
Required oxygen by nasal cannula on admission

# Pneumonia due to COVID-19 virus/viral sepsis:
Presented with hypoxia, mild fever, dyspnea and tachypnea with elevated white cell count
COVID-19 testing positive
droplet/contact/eye protection precautions
Given Dexamethasone 6 mg IV twice daily and Remdesivir
CT chest consistent with bilateral groundglass opacities consistent with viral pneumonia

# Hypertension:
Continue lisinopril and hydrochlorothiazide

# Hyperlipidemia:
Continue atorvastatin at home dose

# Diet:
Cardiac diet

# Code status:
Full code

Today, patient was seen and examined. Patient is doing well. Does not offer any complaints at this time.

**Vitals and labs were reviewed today.**

**Physical Exam:**

HEENT - PERL+
CVS - S1S2 RRR
Resp - CTA B/L
GI - Soft, BS+, NT, ND
Musculoskeletal - No edema
CNS - No FND
Skin - No rashes

**Diagnostic/Radiology Studies:**

EXHIBIT 6

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| Inmate Name: | DONLEY, MALCOLM C | | | | Reg #: | 01972-050 |
|---|---|---|---|---|---|---|
| Date of Birth: | 06/18/1957 | Sex: | M | Race:BLACK | Facility: | PEK |
| Note Date: | 08/19/2020 10:02 | Provider: | | Moats, Scott MD, CD | Unit: | D01 |

Admin Note - Scheduling Note encounter performed at Health Services.
**Administrative Notes:**

ADMINISTRATIVE NOTE  1            Provider:  Moats, Scott MD, CD

The ongoing COVID-19 epidemic has resulted in persistent and unpredictable changes in the provision of health care throughout the country as well as the local community.  BOP facilities have been profoundly affected.  In order to follow current CDC guidelines and mitigate risk within the facility, significant adaptations to medical services have been required.  As a result, the ability to transport patients into the local community for non-emergent evaluations and treatments has been limited.  Out of an abundance of caution, the local executive staff have requested that transfer of inmates into the community be limited to emergent/urgent cases to limit the risk of COVID-19 exposure to both inmates and staff.

In many cases, previously available community medical services have temporarily become limited or simply not available.  Even though many local providers are continuing to serve patients, some have declined to accept inmates due to concerns around COVID-19.

This individual was previously approved for evaluation and/or testing outside of the BOP facility.  The original timeline for this evaluation has required adjustment or cancellation as a result of the COVID-19 epidemic.

All medical cases are monitored on a continuing basis to ensure that emergency situations are addressed.  In addition, the Health Services Unit is continuously working with the institution and local community in order to provide urgent and non-urgent access to evaluations and treatments in the local community.

**Copay Required:** No            **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Moats, Scott MD, CD on 08/19/2020 10:03

EXHIBIT 7

# Have You Been Fully Vaccinated?

In general, people are considered fully vaccinated: [¹]

- 2 weeks after their second dose in a 2-dose series, such as the Pfizer or Moderna vaccines, or
- 2 weeks after a single-dose vaccine, such as Johnson & Johnson's Janssen vaccine

If you don't meet these requirements, regardless of your age, you are NOT fully vaccinated. Keep taking all precautions until you are fully vaccinated.

If you have a condition or are taking medications that weaken your immune system, you may NOT be fully protected even if you are fully vaccinated. Talk to your healthcare provider. Even after vaccination, you may need to continue taking all precautions.



EXHIBIT 8

Vaccine Information for People with Certain Medical Conditions.



This information is intended for a general audience. Healthcare providers should see Underlying Medical Conditions Associated with High Risk for Severe COVID-19 for more detailed information.

# Overview

Adults of any age with **the following conditions can be more likely to get severely ill** from COVID-19. **Severe illness** means that a person with COVID-19 may need:

- Hospitalization
- Intensive care
- A ventilator to help them breathe
- Or they may even die

In addition:

- **Older adults** are more likely to get severely ill from COVID-19. More than 80% of COVID-19 deaths occur in people over age 65, and more than 95% of COVID-19 deaths occur in people older than 45.
- **Long-standing systemic health and social inequities** have put various groups of people at increased risk of getting sick and dying from COVID-19, including many racial and ethnic minority groups and people with disabilities.
    - Studies have shown people from racial and ethnic minority groups are also dying from COVID-19 at younger ages. People in minority groups are often younger when they develop chronic medical conditions and may be more likely to have more than one condition.
    - People with disabilities are more likely than those without disabilities to have chronic health conditions, live in congregate setting, and face more barriers to healthcare. Studies have shown that some people with certain disabilities are more likely to get COVID-19 and have worse outcomes.

If you have a medical condition, **speak with your healthcare provider** about steps you can take to manage your health and risks.

Preventive measures for COVID-19 (including vaccination, wearing a mask and social distancing) are important especially if you are older or have multiple or severe health conditions. You can learn about CDC's COVID-19 vaccine recommendations, including how medical conditions and other factors inform recommendations, here.

EXHIBIT 9

# What You Can Do

  

If you've been fully vaccinated:

- You can resume activities that you did prior to the pandemic.
- You can resume activities without wearing a mask or staying 6 feet apart, except where required by federal, state, local, tribal, or territorial laws, rules, and regulations, including local business and workplace guidance.
- If you travel in the United States, you do not need to get tested before or after travel or self-quarantine after travel.
- You need to pay close attention to the situation at your international destination before traveling outside the United States.
    - You do NOT need to get tested **before** leaving the United States unless your destination requires it.
    - You still need to show a negative test result or documentation of recovery from COVID-19 **before** boarding an international flight to the United States.
    - You should still get tested 3-5 days **after** international travel.
    - You do NOT need to self-quarantine **after** arriving in the United States.
- If you've been around someone who has COVID-19, you do not need to stay away from others or get tested unless you have symptoms.
    - However, if you live or work in a correctional or detention facility or a homeless shelter and are around someone who has COVID-19, you should still get tested, even if you don't have symptoms.

*EXHIBIT 10*

**Note:** The list below does not include all potential medical conditions that could make you more likely to get severely ill. Rare medical conditions may not be included below. However, a person with a condition that is not listed may still be in more danger from COVID-19 than persons of similar age who do not have the condition and should talk with their healthcare provider.

# Medical Conditions in Adults

- This list is presented **in alphabetical order** and not in order of risk.
- CDC completed an evidence review process **for each** medical condition on this list to ensure they met criteria for inclusion on this webpage.
- We are learning more about COVID-19 every day, and this list may be updated as the science evolves.

## Cancer

Having cancer **can make you more likely** to get severely ill from COVID-19. Treatments for many types of cancer can weaken your body's ability to fight off disease. At this time, based on available studies, having a history of cancer may increase your risk.

Get more information:

- Cancer | CDC
- American Cancer Society: What People with Cancer Should Know about Coronavirus ☑

## Chronic kidney disease

Having chronic kidney disease of any stage **can make you more likely** to get severely ill from COVID-19.

Get more information:

- Chronic kidney disease | CDC
- National Kidney Foundation: Kidney disease and COVID-19 ☑

## Chronic lung diseases, including COPD (chronic obstructive pulmonary disease), asthma (moderate-to-severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension

Chronic lung diseases **can make you more likely** to get severely ill from COVID-19. These diseases may include:

- Asthma, if it's moderate to severe
- Chronic obstructive pulmonary disease (COPD), including emphysema and chronic bronchitis
- Having damaged or scarred lung tissue such as interstitial lung disease (including idiopathic pulmonary fibrosis)

*EXHIBIT 11*

- Cystic fibrosis, with or without lung or other solid organ transplant
- Pulmonary hypertension (high blood pressure in the lungs)

Get more information:

- COPD | CDC
- Asthma | CDC
- American Lung Association: Controlling Chronic Lung Diseases Amid COVID-19 ☑
- Cystic Fibrosis | CDC

# Dementia or other neurological conditions

Having neurological conditions, such as dementia, **can make you more likely** to get severely ill from COVID-19.

Get more information:

- Dementia | CDC
- Alzheimer's Association: COVID-19, Alzheimer's and Dementia ☑

# Diabetes (type 1 or type 2)

Having either type 1 or type 2 diabetes **can make you more likely** to get severely ill from COVID-19.

Get more information:

- Diabetes | CDC
- American Diabetes Association: How COVID-19 Impacts People with Diabetes ☑

# Down syndrome

Having Down syndrome **can make you more likely** to get severely ill from COVID-19.

Get more information:

- Down syndrome | CDC
- National Down Syndrome Society: COVID-19 and Down Syndrome ☑

# Heart conditions (such as heart failure, coronary artery disease, cardiomyopathies or hypertension)

Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) **can make you more likely** to get severely ill from COVID-19.

*EXHIBIT 12*